Argued October 14; reversed November 10, 1931; rehearing denied January 5, 1932

## GRAY *v.* WASSELL
(4 P. (2d) 625)

*John W. Kaste,* of Portland, for appellant.
*Bartlett Cole,* of Portland, for respondent.

CAMPBELL, J. This suit is brought to establish the ownership of the estate of R. F. Wassell, deceased, in Lots 3 and 4, Block 141, East Portland, now within the city of Portland, Multnomah county, Oregon.

Plaintiff alleges that R. F. Wassell died July —, 1927, and that plaintiff is the administrator with the will annexed of the estate of R. F. Wassell, deceased.

That about the year 1921, said R. F. Wassell became heavily indebted and thereafter, until his death, transacted substantially all of his business in the name of his father, J. D. Wassell, or of his wife, Alice L. Wassell, defendant herein. That on August 5, 1925, said R. F. Wassell purchased Lots 3 and 4 of Block 141, in East Portland, now within the city limits of Portland, and caused said property to be conveyed to defendant herein, but retained a secret trust for his own use and benefit. That the conveyance was so made for the purpose of preventing his creditors from attaching or seizing said property for his debts. That he thereafter built a garage on said property. That the title of said property is now vested in defendant and that she has received the rents and profits thereof amounting to about $6,000. That said R. F. Wassell, on the — day of —, purchased a lot near Twelfth and Alder streets, Portland, and constructed thereon a building known as the Prince of Wales Hotel, and had the property conveyed to defendant herein for his own use and benefit in secret trust. That defendant collected the rents and proceeds therefrom in the sum of $10,000 and converted the same to her own use. That, about the year 1925, R. F. Wassell bought certain furniture for an apartment house and a hotel and caused the title for the same to be taken in the name of defendant and himself, and that after his death defendant sold said furniture and received $4,000 therefor which she converted to her own use. That said R. F. Wassell bought an automobile and had the title placed in the name of defendant; that said automobile is worth $2,000. Plaintiff then alleges: That all of the above property was purchased by said R. F. Wassell and the consideration paid by him, and the title thereto was caused to be transferred by him to the defendant

as part of his plan to transact business in defendant's name; and said R. F. Wassell retained a secret trust in said property and the dominion and control thereof, and the defendant received title thereto only for the use and benefit of R. F. Wassell. That the defendant held said property at all times subject to the direction, control and dominion of said R. F. Wassell during his lifetime; all of which is known to defendant. That there have been claims to the extent of $8,065 presented and allowed against the estate. That no property has come to the hands of the administrator. That all of the debts represented by said claims were incurred by said R. F. Wassell subsequent to January 1, 1922. Plaintiff prays that all of the above-described property be declared to be the property of the estate of R. F. Wassell, deceased, in so far as the same be required to pay the debts and expenses of administration; and that defendant be required to account for and pay over all the rents and proceeds of the real property above described, and the proceeds of the sale of the furniture and the value of the automobile.

The defendant answered in effect, denying the material allegations of the complaint so far as her ownership of the property in question was concerned.

On these issues and the evidence presented, the trial court found for plaintiff, and decreed that Lots 3 and 4, in Block 141, East Portland, now within the city limits of Portland, is the property of the estate of R. F. Wassell, deceased, so far as necessary to pay the debts and costs of adminstration and that it should be turned over to the administrator for the purpose of administration, and the court further gave a personal judgment against Alice Wassell, defendant, for $957 and costs and disbursements.

Defendant appeals and plaintiff cross-appeals.

It appears from the evidence that, in 1917, R. F. Wassell had conveyed to his wife, Alice Wassell, a house and lot known as 570 East Madison street, Portland. At the time of this conveyance his financial condition was good. He had considerable personal property, and no indebtedness against him. This conveyance was a bona fide transaction free from any taint of fraud or fraudulent intent. R. F. Wassell was a builder, engaged in building hotels and apartment houses, as well as residences and business structures. For a time during the war he was also engaged in the cannery business. Through bad judgment or adverse conditions immediately following the close of the war, he found himself, in 1921, without any property and in debt to one D. B. McBride in the sum of $27,000. Early in 1922, he began doing business in his father's name to a certain extent. He bought what is referred to in the testimony as the Peacock Lane property. The title was in the name of his father, J. D. Wassell. Here he opened up and improved a street and built about twenty-four houses, which, including the lot on which they were built, was each of the value of from $5,000 to $7,500. This was all done on borrowed capital with excessive discounts and carrying charges, so that it does not appear that he made more than his living expenses above the amount borrowed.

On September 25, 1923, Mrs. Wassell mortgaged her home at 570 East Madison street for $5,000. This money apparently went into certain lots bought from the Hawthorne estate which were bought in the name of Alice Wassell in August, 1922. The Hawthorne property was afterwards disposed of by trading for other property which was also taken in the name of Alice Wassell. Without going into the details of the various pieces of property so gotten, suffice it to say;

there is no evidence that R. F. Wassell put any money into any one of said parcels. All of these parcels were improved by erecting a building thereon, and in each case more money was borrowed than the lot and building cost. This is equally true of Lots 3 and 4 in Block 141, which was conveyed by the Ladd Estate directly to defendant. There is no evidence that this property was or is worth any more than it was mortgaged for at the time the building was constructed. There is no competent evidence that R. F. Wassell ever paid any part of the consideration for this particular parcel. All the money borrowed on this property was borrowed by and in the name of Alice Wassell.

■ In order for plaintiff to state a cause of action it was necessary to, and plaintiff did, allege

"That all of said property was purchased by said R. F. Wassell, and the consideration paid by him, and the title thereto was caused to be transferred by him to the defendant * * * and said R. F. Wassell retained a secret trust in said property and the dominion and control thereof."

■ These are affirmative allegations, and, whatever the rule may be in other jurisdictions, the statute establishes the rule in this state regarding the burden of proof.

"Each party shall prove his own affirmative allegations * * *." Oregon Code 1930, 9-225.

"The party having the affirmative of the issue shall produce evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side." Oregon Code 1930, 9-1001.

"That in civil cases the affirmative of the issue shall be proved, and when the evidence is contradictory, the findings shall be according to the preponderance of the evidence." Oregon Code 1930, 9-2001, sub-sec. 5.

The legislature of the state enacted into law these plain provisions of the code; they need no construction and this court has no power to change or nullify them.

■ There was no secrecy about any of these transactions. The conveyance was made and placed on the public records for anyone to see. The evidence is clear and uncontradicted that the only money or property that was in the family of R. F. Wassell, deceased, on January 1, 1922, was that which belong to the defendant, Alice Wassell. Where then did R. F. Wassell get any money of his own to put into any of these properties with which he dealt, from January 1, 1922, to the time of his death? The evidence tends to show that every dollar that went into these transactions carried on in the name of defendant, over and above what the defendant owned, was borrowed, and borrowed in the name of Alice Wassell.

It is claimed in the brief and argument that most of these claims were for labor and materials that went into the buildings erected by R. F. Wassell during the time that he was transacting business under the name of defendant, Alice Wassell, or his father, J. D. Wassell. For these claims there would be no fraudulent intent, nor could there be any hindrance or delay. The lien law of the state afforded ample protection for such labor or materials. There is no contention that any of these creditors were prevented from protecting their claims under the lien laws of the state.

The situation regarding Lots 3 and 4, Block 141, is equally true of the lot and building known as the Prince of Wales Hotel and the furniture therein.

We are not unmindful of the testimony given by J. D. Wassell, most of which is merely his own conclusions:

"Q. Well, you said that Dick (R. F. Wassell) owned the corner of East Sixth and Washington streets?

"A. Yes; sir.

\* \* \* \* \*

"Q. You said that Dick owned it. When did he buy that, do you know?

"A. Well, the month I can't tell you. I know that he bought it.

\* \* \* \* \*

"Q. Now, the house at 570 Madison street belonged to your son?

"A. Yes; sir. I say it did, but he put it in his wife's name.

"Q. It was his property?

"A. It was in his wife's name and he told me the reason he did it. I told the court a while ago. There is no use going over it again."

We turn to his testimony where he gave the explanation of why it was put in defendant's name.

"Q. Why was it put in Alice's name?"

This question was objected to by counsel for defendant and the court finally permitted it to be answered "subject to the objection."

"A. Well, it was while the war was on. I had two sons eligible for the war. My son came to me. He talked to me a good deal about making a trade between Mr. and Mrs. McBride and himself for the other house. Mr. McBride didn't want the house but Mrs. McBride did. When they got ready to trade it, my son said: 'I will put it in my wife's name so she will have it. I am losing money,' he said: 'I will put it in my wife's

name so if anything happens to me during the war she will have it.' I agreed with him that it was the right thing to do. My son was in the first draft and I went over and said    *    *    *

"Mr. Kaste (interrupting). Never mind what you said. We don't want to hear what you said.

"A. Well; I am giving you the truth. I will give you the truth and I want you to see it is the truth. I never tell lies. I tell the truth all the time."

We must remember that notwithstanding this witness's assertion of his truthfulness, he is the one who is principally interested in the outcome of this case. We must also remember that death has prevented any testimony from his son, R. F. Wassell.

In reference to the furniture, fixtures and furnishings in the house known as the Duke of York Apartments, the evidence shows that defendant paid what little was paid on those. It is claimed by the plaintiff that defendant received $4,000 for the furniture. This money was paid by Strong & Crum, Inc. Mr. Virgil Crum, a highly reputable attorney, and one of the stockholders of the purchasing corporation, testified in response to the question asked him by the court as to what the $4,000 was paid for:

"A. The furniture bought at Meier & Frank's I did not consider worth anything. In fact, we let Meier & Frank start to take it out, and then they put it back again and accepted some ten thousand dollars for a seventeen-thousand-dollar balance on their contract, and the same thing occurred with the P. E. P. Co.; they accepted twenty-eight hundred dollars, and there was a balance due them of five thousand dollars. I did not consider the equity in the furniture worth anything except to get it and not to disturb the tenants at that time. They had Murphy beds all over the building, and they showed me bills paid in full at a cost of

eighteen hundred forty dollars, and, of course, if we did not get them we would have to buy new beds right away, and they claimed the same thing about the awnings and the screens, that they were paid for in full, and these were the only things of value we got outside of possession. It was more a matter of settlement of the entire thing and to give us immediate possession than putting a value on anything. She had already collected over a thousand dollars in rent that I saw no way of getting back, and so we gave her credit for that, and I think we paid her something less than three thousand dollars at the time of settlement. I had asked for a receiver and Judge Morrow was not very fond of granting requests for appointing receivers, and I thought it might drag over until she got more than three thousand dollars out of it."

From a careful consideration of all of the evidence and the law in the case, we are of the opinion that the decree of the lower court should be reversed and one entered here dismissing the case without costs or disbursements to either party. It is so ordered.

BEAN, C. J., BROWN and BELT, JJ., concur.